***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Gregory. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Gregory with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. Defendant was subject to the Workers' Compensation Act in September 1999.
2. Defendant was insured through the North Carolina Automobile Dealers Self-Insurers Fund in September 1999.
3. Defendant-employer completed I.C. Form 19 for filing on March 22, 2000.
4. Plaintiff, through his counsel, filed I.C. Form 18 on June 29, 2000 for bilateral Carpal Tunnel Syndrome.
5. Defendant-employer prepared I.C. Form 60 indicating an average weekly wage of $1732.86 and a maximum compensation rate of $560.00 on July 19, 2000.
6. The parties voluntarily mediated this claim in August 2002. The mediation was unsuccessful.
7. Plaintiff filed a motion to consolidate the I.C. File Numbers for the left hand and the right hand and a motion for attendant care services in September 2002.
8. Plaintiff filed a request for hearing on January 31, 2003 and the Industrial Commission ordered the claim into mediation.
9. An administrative order consolidating the cases was filed on February 11, 2003 but the attendant care issue required an evidentiary hearing.
10. Defendant filed I.C. Form 33R on March 20, 2003.
11. The Industrial Commission ordered mediation was held on March 28, 2003.
12. The parties reached a temporary agreement and scheduled the claim for a third mediation on July 1, 2003.
13. The July 1, 2003 mediation was not successful and the discovery deposition of Dr. Gualtieri was taken on July 24, 2003.
14. Plaintiff requested that this claim be placed on the hearing docket by letter on August 28, 2003.
15. The parties stipulated into evidence Stipulated Exhibits #1-8 consisting of a pretrial agreement, 2 bound note-books with tabs A through L, 4 videotapes of surveillance footage and a packet of surveillance reports.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was 40 years old and resided in Clayton. Prior to plaintiff's workers' compensation claim, he worked for defendant-employer for approximately ten years as a finance manager whose duties included using a keyboard, calculator, and other writing instruments. As a result of his employment, plaintiff contracted and was diagnosed with carpal tunnel syndrome in September or October 1999. Thereafter, defendants filed a Form 60 admitting compensability for plaintiff's carpal tunnel syndrome.
2. Plaintiff presented at the hearing before the deputy commissioner wearing gloves appearing to be made out of material similar to neoprene and sunglasses. Plaintiff indicated that he wears the gloves approximately 75% of the time and uses them to prevent swelling in his hands. Plaintiff desires a new pair of gloves each day and indicates that the gloves stretch or tear or become unsanitary. Plaintiff indicated that he is sensitive to light and therefore wears the sunglasses.
3. On direct examination, the deputy commissioner noted that plaintiff's speech pattern was somewhat unusual and often slow or displaying somewhat of an unusual accent. Plaintiff also had difficulty choosing words and remembering facts. However, the deputy commissioner noted that upon cross-examination, plaintiff's speech pattern and memory improved remarkably. Plaintiff attributed his speech pattern to anxiety and the numerous medications he takes. This unusual speech pattern and behavior was explained by Dr. Gualtieri, one of plaintiff's primary treating physicians, as part of plaintiff's hysterical personality. Dr. Gualtieri did not believe that plaintiff's odd speech patterns or other unusual behavior, which Dr. Gualtieri had witnessed, indicated malingering or a lack of credibility on plaintiff's part.
4. As a result of his compensable injury, plaintiff underwent right carpal tunnel release surgery on December 6, 1999 performed by Dr. Wallace Andrew. During the surgery, plaintiff felt a sharp pain throughout his body. Plaintiff asserts that the right median nerve was damaged during surgery. Dr. Andrew indicated on February 16, 2000 that the median nerve might have been bruised. After surgery, plaintiff experienced chronic right hand pain and was diagnosed with reflex sympathetic dystrophy or complex regional pain syndrome by Dr. Kenneth Carnes, a neurologist, who first saw plaintiff in March 2000. Dr. Carnes restricted plaintiff from writing and he was taken out of work. Eventually, Dr. Carnes also advised plaintiff not to drive due to the condition of his hands. Dr. Gualtieri later also advised plaintiff not to drive, as he would not be safe driving due to the condition of his hands and medication side effects.
5. Plaintiff continued having hand and arm pain and, as a result, began experiencing frustration and depression. Dr. Carnes recommended psychotherapy and plaintiff began treatment with Merya V. Wolfe, licensed clinical social worker, in October 2000. Dr. Carnes also referred plaintiff to a psychiatrist. Defendants referred plaintiff to Dr. Thomas Gualtieri, a neuropsychiatrist, in August 2001. In addition, plaintiff was referred to Dr. Stephen Gupta at Rex Pain Clinic for evaluation. Dr. Gupta also diagnosed plaintiff with reflex sympathetic dystrophy type I and significant depression and psychological problems.
6. Both Dr. Carnes and Dr. Gualtieri, plaintiff's treating physicians agree that plaintiff suffers from complex regional pain syndrome, which resulted from his compensable carpal tunnel syndrome or the surgery he underwent to treat the carpal tunnel syndrome. In addition, both Dr. Carnes and Dr. Gualtieri agree that plaintiff's psychological issues were caused by his carpal tunnel syndrome and accompanying complex regional pain syndrome. Finally, both Dr. Carnes and Dr. Gualtieri believe that plaintiff is unable to work due to his work-related injury and consequences.
7. Plaintiff also began having severe headaches, neck pain and constipation, which are related to his pain syndrome or medications given to treat his symptoms. Plaintiff also began experiencing erectile dysfunction. Plaintiff has been prescribed Viagra to treat his condition.
8. Defendants requested an IME with Dr. Warren Burrows in Charlotte, North Carolina. Dr. Burrows examined plaintiff; however, plaintiff did not remove his gloves during the examination. Dr. Burrows diagnosed plaintiff with possible median nerve injury and resultant Complex Regional Pain Syndrome Type I, left Carpal Tunnel Syndrome, depression and vocational problems related to chronic and persistent right hand pain and hyperesthesia.
9. Plaintiff began having problems taking his numerous medications properly and accidentally overdosed. Consequently, Dr. Carnes ordered a medication dispensing machine and home health care for a nurse to monitor the machine. Dr. Gualtieri agreed with this order and actually had his staff to fill the machine prior to the home health nurse beginning to fill the machine on a monthly or as needed basis.
10. Prior to his compensable injury, plaintiff and his wife cared for the house and yard with plaintiff's wife performing all of the housework and plaintiff performing most of the yard work such as raking and mowing. Plaintiff and his wife separated in approximately March 2002. Thereafter, on several occasions beginning on May 7, 2002, Dr. Carnes, ordered attendant care to provide relief and to assist plaintiff with housekeeping, including vacuuming or dusting or changing the sheets, mopping the floors, laundry and folding laundry, grocery shopping and yard work. Dr. Carnes recommended a weekly frequency for services. In late April 2002, as documented by letter dated May 6, 2002, Dr. Gualtieri also recommended attendant care for plaintiff to assist him with house cleaning every two weeks and yard work assistance, specifically lawn mowing, weekly during the growing season.
11. Defendants provided assistance with plaintiff's medication needs through a dispenser and a home-health nurse. However, defendants denied plaintiff further attendant care. In order to obtain assistance with house cleaning and yard work needs, plaintiff hired chore workers to help to do housework and laundry. Plaintiff paid Alessandra Smith $1,800.00 from March 25, 2002 until September 2, 2002. Ms. Smith charged plaintiff $75.00 per week. Thereafter, plaintiff paid Nicole Yeager $7,645.00 from September 7, 2002 through December 5, 2003 for household services, which were performed weekly at various amounts ranging from $40.00 to $150.00. In addition, plaintiff paid Grade Works, Inc. $5,083.00 in 2002 and $5,082.96 in 2003, or $423.58 per month for assistance with his yard work. Grade Works, Inc.'s services included mowing every 7 days during the summer and every 7 to 10 days in the fall and spring and every 10 days or "as needed" in the winter. Services also included edging, weed eating, pruning, blowing leaves or yard debris, and cleaning up trash. In addition, Grade Works has a specialist on staff in Turf Management who provides six fertilizer applications and aerates and over seeds the lawn.
12. At the time of the hearing before the deputy commissioner, plaintiff lived in a large home, approximately 6,200 square feet, with his daughter and son-in-law who both work full-time. However, plaintiff's home was for sale at the time of the hearing before the deputy commissioner. According to plaintiff, the household services provided to him by the chore workers assisted with cleaning approximately 2,200 square feet of the home and plaintiff's daughter was responsible for cleaning the larger portion of the home, which was considered "her section" of the house.
13. Plaintiff testified at the hearing before the deputy commissioner that while folding towels, he felt a bolt of lightening going through his arm. Plaintiff further testified that the pain was so great that it knocked him off of his feet, onto the floor. Defendants denied the compensability of plaintiff's left shoulder complaints. Plaintiff sought treatment from Drs. Gualtieri, Vyas, Carnes and Esposito. Plaintiff's x-rays at Dr. Vyas' office were read by Carolin Regional Radiology and he had an MRI, which revealed no abnormalities. Although medical testimony was presented which indicated that the shoulder pain may be related to plaintiff's regional pain syndrome, the greater weight of the evidence shows that plaintiff experienced an acute injury while at home folding towels. Further, the evidence shows that the MRI conducted on plaintiff's shoulder was done to determine whether there were any structural changes. Plaintiff's treatment for regional pain syndrome was not changed due to plaintiff's shoulder pain.
14. Dr. Gualtieri recommended that plaintiff go to Rex Wellness Center for reconditioning in a supervised setting. However, at the hearing plaintiff indicated that Rex Wellness Center would not accept his application due to his health conditions. Drs. Gualtieri and Carnes believe that deconditioning is a natural consequence of chronic pain from RSD and that a supervised program such as Rex Wellness would give relief to plaintiff. In addition, both Drs. Gualtieri and Carnes believe that plaintiff should become more active; however, neither believes that plaintiff should become more active via household chores or use of his upper extremities. Dr. Gualtieri indicated that plaintiff needed to begin an exercise program in a supervised capacity such as at the Wellness center or with a personal trainer but that plaintiff could potentially eventually attend a gym closer to his home after he has become more self-sufficient.
15. In addition to recommending a conditioning program, Dr. Carnes recommended a referral to Rex Pain Clinic. Neither Dr. Carnes nor Dr. Gualtieri thought an inpatient pain facility in Charlotte would benefit plaintiff and both were concerned that he remain closer to home to help with his anxiety. Considering the greater weight of the evidence, plaintiff would benefit from receiving an evaluation from Rex Pain Clinic and attending the clinic if the evaluation so indicates. Furthermore, plaintiff would benefit from reconditioning with the assistance of the Rex Pain Clinic and potentially the Rex Wellness Center in the event that the Rex Pain Clinic concurs with the treating physicians recommendations and in the event that Rex Wellness Center is amenable to plaintiff's participation. Furthermore, plaintiff may eventually benefit from a less supervised program closer to his home depending on his progress.
16. While Dr. Carnes initially prescribed new gloves every day at the request of plaintiff, the greater weight of the evidence of record including the medical testimony demonstrates that new gloves each week rather than daily is reasonably necessary to effectively provide relief of plaintiff's swelling and maintain a sanitary condition of the gloves.
17. Both Dr. Gualtieri and Dr. Carnes believe that plaintiff is credible with regard to his pain and presentation. Dr. Carnes was adamant that plaintiff's pain was real and that he would not change his mind with regard to plaintiff's credibility. While Dr. Gualtieri had observed some of plaintiff's unusual behavior or exaggerations including plaintiff's speech patterns, he also felt that plaintiff was credible and not malingering but instead displaying a somewhat hysterical personality with anxiety and some exaggerations, which are not uncommon with patients experiencing chronic pain or severe depression.
18. Plaintiff has not shown that any erectile dysfunction which he is experiencing was caused by the compensable injury.
19. Surveillance footage of plaintiff was obtained during June through September 2003, which revealed plaintiff riding as a passenger in a car to attend various appointments or lunch and plaintiff performing various activities in his yard. Specifically, plaintiff performed a few minor activities such as eating, retrieving mail, watering plants on the deck and rearranging a flag. Plaintiff also used a hammer on the deck and a garden hose with a spray nozzle to clean a doghouse in the yard. During the surveillance footage, plaintiff wore his gloves for approximately 75% of the time, consistent with his testimony. Most activities displayed on the surveillance were brief in nature and somewhat innocuous. However, based upon plaintiff's complaints of pain including that his hands severely hurt when resting them on the table, plaintiff's ability to use the spray nozzle appeared somewhat inconsistent with his testimony regarding the level of his hand pain. Nevertheless, when presented with the facts of plaintiff's activities, neither treating physician was influenced by plaintiff's activities including the use of the spray nozzle.
20. While plaintiff's behavior is somewhat unusual and minimally inconsistent, the greater weight of the evidence demonstrates that he nevertheless suffers from genuine intractable pain, which necessitates the recommendations of Drs. Carnes and Gualtieri including the past and future attendant care. However, plaintiff is entitled to only reasonably necessary attendant care which includes the past household services provided by the two chore workers and similar future services one time per week.
21. Plaintiff needs assistance with heavy yard work such as mowing and raking, however, the services provided by Grade Works exceed the reasonable requirements of basic lawn care. Specifically, care by an individual with a degree in Turf Management and a minor in Ornamental Science is not reasonably required to provide relief. Accordingly, plaintiff reasonably requires basic lawn care services twice per month during the growing season and less often, once a month, during the remainder of the year. While plaintiff requires past lawn care, the past service should be reimbursed at a reasonable rate based upon the cost of the reasonable future lawn care rather than the amount paid to Grade Works.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. As a result of his compensable injury, plaintiff continues to be temporarily totally disabled and entitled to weekly benefits. N.C. Gen. Stat. § 97-29.
2. Plaintiff's current medical conditions including reflex sympathetic dystrophy or complex regional pain syndrome, depression, and deconditioning are causally related to his compensable injury. N.C. Gen. Stat. § 97-25. Plaintiff's shoulder pain and erectile dysfunction are not causally related to his compensable injury. Id.
3. Plaintiff is entitled to reasonably necessary medical care related to his injury by accident for so long as such treatment tends to effect a cure, provide relief, or lessen the period of plaintiff's disability. N.C. Gen. Stat. § 97-25.
4. Plaintiff is entitled to a new pair of gloves on a weekly basis.Id.
5. Plaintiff is entitled to past and future attendant care services for household cleaning and chores to be provided once a week by an unskilled chore worker. Plaintiff is entitled to reimbursement for past services rendered to and paid for by plaintiff to Alessandra Smith in the amount of $1,800.00 for the time period of March 25, 2002 until September 2, 2002, and to Nicole Yeager in the amount of $7,645.00 from September 7, 2002 through December 5, 2003. Plaintiff is entitled to future attendant care services for household cleaning and chores in the amount of $75.00 per week. Id.
6. Plaintiff is entitled to future reasonable lawn care for mowing and raking, including services twice a month during the growing season and on a less frequent basis, once a month, during the winter months. Such services shall not exceed $150.00 per month. While plaintiff is entitled to partial reimbursement for past lawn care, such reimbursement should be based upon the allowance given herein for future lawn care. Id.
7. Plaintiff is entitled to an evaluation and treatment, if recommended, at Rex Pain Clinic as well as a supervised program to assist with his deconditioning, which will be better determined with the assistance of Rex Pain Clinic as it is unclear whether Rex Wellness Center is willing to accept plaintiff's application. Id.
8. Plaintiff is entitled to reasonably necessary transportation services for sick travel in conjunction with all reasonably necessary medical treatment and care, as plaintiff is unable to drive at this time. Id.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendants shall continue to pay plaintiff weekly benefits for his temporary total disability.
2. Defendants shall pay for all reasonably necessary medical treatment for plaintiff's reflex sympathetic dystrophy or complex regional pain syndrome, depression, and deconditioning, which are causally related to his compensable injury by accident.
3. Defendants shall pay for plaintiff's evaluation and treatment, if recommended, at Rex Pain Clinic as well as a supervised program to assist with his deconditioning, which will be better determined with the assistance of Rex Pain Clinic as it is unclear whether Rex Wellness Center is willing to accept plaintiff's application.
4. Plaintiff is entitled to a new pair of gloves on a weekly basis.
5. Plaintiff is entitled to past and future attendant care services for household cleaning and chores to be provided once a week by an unskilled chore worker. Plaintiff is entitled to reimbursement for past services rendered to and paid for by plaintiff to Alessandra Smith in the amount of $1,800.00 for the time period of March 25, 2002 until September 2, 2002, and to Nicole Yeager in the amount of $7,645.00 from September 7, 2002 through December 5, 2003. Plaintiff is entitled to future attendant care services for household cleaning and chores in the amount of $75.00 per week.
6. Plaintiff is entitled to future reasonable lawn care for mowing and raking, including services twice a month during the growing season and on a less frequent basis, once a month, during the winter months. Such services shall not exceed $150.00 per month. While plaintiff is entitled to partial reimbursement for past lawn care, such reimbursement should be based upon the allowance given herein for future law care.
7. Defendants shall pay or provide for reasonably necessary transportation services for sick travel in conjunction with all reasonably necessary medical treatment or care, as plaintiff is unable to drive at this time.
8. An attorney's fee in the amount of 25% is hereby approved for plaintiff's counsel J. Lee Hatch who shall receive attorney fees of 25% by deducting every fourth check and forwarding the same to him.
This the ___ day of March, 2005.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER